IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    Cr. No. 11-02867-JCH

JOEL RODRIGUEZ,

    Defendant.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Joel Rodriguez' *Motion to Dismiss for Pre-Indictment Delay* (Doc. 14), *Motion to Sever Count I From Count II* (Doc. 13), and *Motion to Suppress Evidence* (Doc. 23). On April 25, 2012, the Court held an evidentiary hearing on the motions, at which Defendant was present and represented by Brian A. Pori, and Raul Torres represented the United States. After considering the motions, briefs, testimony offered into evidence at the hearing, and the arguments of counsel, and being otherwise fully informed, the Court concludes that Defendant's motions should be denied.

### FACTS

**Facts Relating to Count I, Interference with Commerce by Robbery (18 U.S.C. § 1951).[1]**

On May 17, 2011, Defendant allegedly robbed Anita Alires, a teller at Check 'n Go, a payday loan lender and check-cashing establishment located at 2810 Coors Blvd. NW in

---

[1] The parties did not offer testimonial evidence on Count I at the motion hearing, and Defendant did not offer his own version of events with respect to Count I in his briefing on the instant motions.

Albuquerque.  Video surveillance reportedly shows that Defendant exited the passenger side of a gold GMC Yukon SUV and entered the store shortly before the robbery.  The identity of the driver of the SUV is unknown.  At some point, the gold Yukon began to circle the store's parking lot while Defendant was still inside.

After Defendant entered the Check 'n Go, Ms. Alires claims that he approached her and demanded the "money bag," while touching his hand to an object inside his waistband.  Ms. Alires believed the object was a gun. Video surveillance allegedly confirms that Defendant touched an unidentified object in the manner described, but never brandished a weapon or removed the object from his waistband.  Ms. Alires complied, turning over $288.95.  Defendant then exited the business and the gold Yukon SUV "head[ed] in the same direction."

In interviews with law enforcement, Check 'n Go employees identified Defendant as the robber.  Employees further stated that Defendant's wife Renee briefly entered the store the day before the robbery, May 16, 2011, but left before conducting any business.  A female teller also reported that she was aware that Renee Rodriguez drove a gold SUV.  (It is unclear how the teller knew of Mrs. Rodriguez and the vehicle she drove).

**Facts Relating to Count II, Possession of a Firearm and Ammunition by a Convicted Felon (18 U.S.C. §§ 922(g)(1) and 924 (e)(1)).**

On May 24, 2011, at 12:21 a.m., Bernalillo County Sheriff's Deputy J. Hessinger observed Defendant driving his wife's gold GMC Yukon without a functioning license plate light at a slow rate of speed (about 7 mph) in the vicinity of 174 La Vega Rd. SW in Albuquerque.  The stretch of La Vega Road where Defendant was observed did not have any streetlights and was known to Hessinger to be in a high-crime area.  Hessinger pulled Defendant over and approached the driver's side of vehicle.

Hessinger inquired why Defendant was driving so slowly, and Defendant informed him that he was out searching for his wife Renee, who had left their home on foot after an argument. Hessinger testified that he considered Defendant's explanation "a little odd . . . just because his address was a long way[] away from where he was looking for her on La Vega." (Tr. at 22:12-22:14). Hessinger then asked Defendant for his driver's license, registration, and proof of insurance, and, after Defendant could only locate his license, asked Defendant to remain in his vehicle and "keep looking for the insurance and registration," *id.* at 22:22-22:23, while he ran the license to determine whether there were any active warrants for his arrest.

According to the testimony of Renee Rodriguez, it was at this point that she called Defendant on her mobile phone for the third time that evening – having made two earlier calls to him asking to pick her up in the vicinity of Isleta and Cesar Chavez Streets, and wondering why he was delayed – and learned that he had been stopped by a police officer on La Vega Road. Mrs. Rodriguez proceeded on foot to where the vehicle was stopped, and testified that she appeared on the scene while Deputy Hessinger was still running Defendant's license and Defendant was still waiting in his vehicle. Mrs. Rodriguez identified herself to Hessinger and explained that the vehicle was hers. Hessinger permitted her to retrieve the vehicle registration and insurance from the passenger compartment of the Yukon, then directed her to remain seated on the sidewalk. Hessinger's testimony supports Mrs. Rodriguez' account of events, with one exception: he contends that Mrs. Rodriguez did not appear at the scene – and thus was not permitted to retrieve the documents from inside the vehicle – until after he had already conducted his vehicle search and taken Defendant into custody.

As he reapproached the vehicle, Hessinger observed Defendant move back and forth in his seat in a fidgety manner and reach between the driver's seat and middle console, though he

could not see Defendant's hands.  Hessinger testified that the area in which Defendant was reaching was "just not a common place [to keep documents] for anybody who keeps any vital information that they need to give us on a car stop," (Tr. at 64:23-64:25), and that his movements were not consistent with the actions of someone searching for documents, but rather were consistent with the actions of someone concealing something.  (Tr. at 79:5-79:12).  Based upon the time of the day, his inability to see inside the car, and Defendant's movements, which he considered suspicious, Hessinger asked Defendant to exit the vehicle while he conducted a limited search of the immediate area to ensure that Defendant did not have access to a weapon.  Defendant refused to consent to the search.  Hessinger then ordered Defendant out of the vehicle and proceeded to pat him down, finding nothing.  He then conducted a search of Defendant's vehicle, turned up a loaded 9mm semi-automatic handgun, and arrested Defendant, who advised him that he was a convicted felon.  Hessinger also ran Renee Rodriguez' license, learned she had an outstanding arrest warrant, and placed her under arrest.

## CONCLUSIONS OF LAW

**I. MOTION TO DISMISS FOR PRE-INDICTMENT DELAY**

Defendant has failed to meet his burden to make either of the two showings required to prevail on his motion to dismiss for pre-indictment delay: first, that he will suffer actual prejudice on account of the lapse of six months from the dates of the alleged offenses until his indictment by the grand jury; and second, that the delay was deliberately timed by the government to win a tactical advantage.  *See United States v. Johnson,* 120 F.3d 1107, 1110 (10th Cir. 1997); *see also United States v. Colonna,* 360 F.3d 1169, 1176-77 (10th Cir. 2004).

**A. Whether Defendant Has Shown Prejudice**

"[T]he defendant bears the burden of proving that the government's delay actually prejudiced him; speculative surmise about what the evidence might have shown but for the government's delay is not enough." *United States v. Koch*, 444 Fed. Appx. 293, 298 (10th Cir. 2011). *See also Johnson,* 120 F.3d at 1110 ("Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice for the purposes of impermissible pre-indictment delay") (quotation omitted). Defendant claims that he has been prejudiced in three ways: (1) he has "suffered from the typical types of harm which inhere after a delay . . . memories have faded, witnesses have disappeared and cannot be located, and important pieces of evidence have been irretrievably lost," (Doc. 14 at 5-6); (2) rather than be transferred to a federal prison to begin serving his sentence and earning good conduct sentence reduction credits, the delay has required him to remain in pre-trial detention, in a facility that lacks any meaningful rehabilitation and/or reform programs; and (3) he has lost the opportunity to serve any sentence he may receive for the offenses in the indictment concurrently with the sentence he is already serving for violating the conditions of his supervised release.

**1.) "Memories Have Faded, Witnesses Have Disappeared, and Important Pieces of Evidence Have Been Lost"**

Despite being afforded numerous opportunities in his briefs and at the evidentiary hearing, Defendant has failed to specify any of the ways the passage of six months from the dates of the alleged offenses to the date of indictment has resulted in the actual loss of any evidence or in lost memories or disappearances among his potential witnesses – the types of

"typical harm" that his brief vaguely suggests have happened here.[2]

### 2.) Defendant's Pre-Trial Detention

The Court likewise rejects Defendant's perfunctory contention that the delay prejudiced him in his ability to more promptly take advantage of the "meaningful programs of rehabilitation and reform" afforded by a federal prison. (Doc. 14 at 6). Defendant cites *Moore v. Arizona*, 414 U.S. 25, 27 (1973), in which the Supreme Court noted in dicta that "no court should overlook the possible impact pending charges might have on [a defendant's] prospects for parole and meaningful rehabilitation," in remanding a case involving a far lengthier, three-year pre-indictment delay. The Court finds the purported delay at issue in this case is more properly compared to the one in *Barker v. Wingo,* 407 U.S. 514, 534 (1972), in which the Supreme Court determined that, even for one not yet convicted, ten months of pretrial incarceration resulted in "minimal" prejudice. Accordingly, the Court finds that Defendant's inability to receive prison-sponsored rehabilitation efforts at an earlier time does not constitute prejudice justifying dismissal of this case.

### 3.) Lost Opportunity to Serve a Concurrent Sentence

Finally, the Court follows the law of this Circuit in concluding that Defendant has not been prejudiced by losing the opportunity to serve any sentence he receives for the offenses at issue concurrently with the sentence he is already serving for violating the conditions of his

---

[2]While Defendant stated in a footnote in his brief that he was "prepared to make a detailed showing *in camera* and out of the presence of the prosecution" of how evidence was actually lost or compromised by pre-indictment delay, (Doc. 14 at 6 n.2), in light of his failure to raise his request for *in camera* consideration at the evidentiary hearing, the Court considers the request waived. *See* Tr. at 120:4-121:24 (counsel for Defendant responding to the Court's invitation to address any argument raised in his motion by speculating that the government's alleged delay in bringing indictment "seems a calculated effort to take advantage of the passage of time, fading memories, hope that witnesses disappear.").

supervised release in his other case, CR. No. 11:1176-JCH.  Presented with the same argument in *United States v. Cone*, the Tenth Circuit found that the defendant

> could have moved for an adjustment in his sentence in this case to compensate for the opportunity he claims to have lost.  Even if the sentencing guidelines under which [defendant] was sentenced did not explicitly provide for a downward departure on these facts, he could have requested a variance now that the guidelines are advisory.  That leaves his lost opportunity argument very hypothetical.  Unlike cases involving different courts, different jurisdictions, or different sovereigns . . . both of [defendant's] sentences were imposed by the same court, affording a unique opportunity for individualized treatment of his crimes and circumstances.

310 Fed. Appx. 212, 220-21 (2008).  Thus, because other opportunities for seeking a concurrent sentence remain open to him, the Court concludes that Defendant has not suffered prejudice on this ground, either.[3]

## B.  Whether Delay Was Purposeful

Because Defendant has not offered any evidence that he has been prejudiced by a pre-indictment delay, the Court need not need to reach the issue of whether the delay was purposeful.  Accordingly, the Court finds that Defendant's motion to dismiss should be denied.

## II.  MOTION TO SEVER COUNTS I AND II

Next, Defendant argues that, in the alternative to dismissing the indictment outright, severance is necessary because the two counts are improperly joined and because trying them together will result in prejudice to him. Two or more offenses may be charged in the same indictment and listed at separate counts if they "are based on the same act or transaction or on

---

[3] Moreover, the Court notes Defendant's own role in contributing to the delay at issue, as it is undisputed that he violated the standard condition of his supervised release that "[t]he defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer."

7

two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The decision to grant a severance of otherwise properly-joined claims is within the sound discretion of this Court if the Court finds that Defendant will be prejudiced by joinder. *United States v. Jones,* 213 F.3d 1253, 1260 (10th Cir. 2000); Fed. R. Crim. P. 14. The Court finds that the counts are properly joined and that Defendant need not be prejudiced by trying them together.

## A. Joinder of Counts I and II

The Tenth Circuit construes "common scheme or plan" liberally to allow for frequent joinder. *See United States v. Johnson,* 130 F.3d 1420, 1427 (10th Cir. 1997) (Rule 8 is construed "broadly . . . to enhance the efficiency of the judicial system"); *Jones*, 213 F.3d at 1260 (joinder of counts for robbery, armed robbery, and being a convicted felon in possession of a firearm was appropriate because "the felon in possession of a firearm and ammunition charges were connected to the defendant's participation in the robberies for which he was charged," despite the fact that the arrests were not simultaneous and were in fact part of a months-long crime spree); *United States v. Valentine*, 706 F.2d 282, 289 (10th Cir. 1983) (charge for possession of cocaine with intent to distribute was properly joined to two-weeks-earlier charge of receipt of firearms by convicted felon, where circumstantial evidence showed firearms were present at the scene of the drugs arrest). Indeed, the Tenth Circuit has "held repeatedly that felon in possession counts may be tried with other counts, especially where . . . the felon in possession counts are factually connected to the other counts due to defendant's own conduct." *United States v. Baker*, 2007 WL 4731083, at *7 (D. Colo., Jan. 14, 2007) (finding that counts should not be severed simply because offenses charged were "factually dissimilar," and, further, that evidence that defendant used a gun in a carjacking and was charged two days later with being a felon in

possession of a firearm – while also in possession of carjacking victim's ID – showed that these were "two concatenated transactions," such that evidence of firearm possession would be admissible at a separate carjacking trial "as either res gestae or under Fed. R. Evid. 404(b)"). Thus, the Court finds that the offenses listed at Counts I and II constitute a series of crimes over a one-week period connected by the common presence of Defendant himself, use of the same vehicle, and alleged presence of a firearm at both scenes.

## B.  Absence of Prejudice

Further, Tenth Circuit authority counsels against finding that joinder would be prejudicial in these circumstances.  "The Tenth Circuit has held consistently that there is no prejudicial joinder where a felon in possession of a gun count is tried at the same time as other counts, including robbery," having repeatedly noted that jurors may be "trusted to follow the instructions they are given, namely that they consider the evidence as to each count . . . . separately." *Baker*, 2007 WL 4731083, at *8 (collecting cases); *see also Jones* 213 F.3d at 1260-61 (potential for prejudice could be cured by limiting instruction); *United States v. Sturmoski*, 971 F.2d 452, 460 (10th Cir. 1992) (no prejudice where felon-in-possession-of-firearm count was related to other count for drug trafficking, which involved use of a gun, and no undue emphasis placed on the prior conviction); *Valentine,* 706 F.2d at 290 (no prejudice where prior conviction did not receive undue emphasis at trial); *United States v. Riblet*, 91 Fed. Appx. 128, 129 (10th Cir. 2004) ("this court has consistently upheld joinder when a defendant is charged with being a felon in possession of a firearm in addition to substantive crimes") (declining to accept defendant's "invitation to disregard this line of precedent" and sever felon-in-possession-of-firearm count); *United States v. Roe*, 495 F.2d 600, 604 (10th Cir. 1974) (no abuse of discretion for failure to sever counts where court issued limiting instruction); .  Consequently, because the potential for

prejudice to Defendant can be remedied by a limiting instruction, the Court finds that Counts I and II need not be severed.

**III. MOTION TO SUPPRESS**

Finally, while Defendant concedes that the initial stop of his vehicle was justified, he contends that Deputy Hessinger exceeded the lawful scope of the stop when he patted him down and searched the interior passenger compartment of the vehicle.[4] The Court finds that Hessinger possessed "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant[ed]" the belief that Defendant was potentially armed and dangerous. *Michigan v. Long*, 463 U.S. 1032, 1049-50 (U.S.1983), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (U.S. 1968).

According to his testimony, Deputy Hessinger formed a suspicion that Defendant could be armed and dangerous after watching him fidget in his seat, while appearing to place something between the driver's seat and middle console. At the time Hessinger made this observation, he was in a poorly lit, high-crime area, approaching a vehicle without a functioning license plate light. *See United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (including fact that defendant was "in a car driving around a high crime area of Tulsa at 2:30 on a Tuesday morning, a time when there were no other cars or people around" and fact that car "did not have a tag light, which in the observing officers' experience could indicate a desire to avoid identification," as justification for pat-down search). While Hessinger had, by his own

---

[4] Defendant further suggests that Hessinger violated the Fourth Amendment from the moment he ordered him out of his vehicle. This argument is moot in light of Defendant's concession that the stop was "justified at the inception." *See Pennsylvania v. Mimms,* 434 U.S. 106, 111 (U.S. 1977) (ordering a driver out of his car, following an "admittedly justified" initial stop, "can only be described as [a] *de minimis*" additional intrusion).

admission, permitted Defendant to continue looking for his proof of insurance and vehicle registration while he ran his driver's license, he noted upon re-approaching the vehicle that Defendant was reaching down between the driver's seat and console, an area where, in Hessinger's experience, such documents are not typically kept.[5] Defendant's demeanor had also altered from "calm [and] collected," during the first part of the stop, to "more nervous," on Hessinger's re-approach. (Tr. at 64:19-64:22). Moreover, Hessinger could not make out the object that Defendant was potentially concealing, as he could not see his hands. The Court finds this confluence of circumstances was sufficient to create a reasonable suspicion on Hessinger's part that Defendant could be armed and dangerous, thereby justifying his ensuing pat-down of Defendant and search of his vehicle. *See United States v. Dennison*, 410 F.3d 1203, 1213 (10th Cir. 2005) (noting that vehicle search "occurred late at night in a high-crime area, and officers could not clearly tell whether [the defendant] had weapons in the vehicle within reach," in upholding the reasonableness of *Terry* stop and search); *see also United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) ("furtive gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion"). Accordingly, Defendant's motion to suppress will be denied.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's *Motion to Dismiss for Pre-Indictment*

---

[5] While counsel for Defendant suggested at the hearing that Defendant might plausibly have been reaching for the registration and insurance documents after they had "fallen out of the console and got lost between that area," (Tr. at 65:1-65:2), according to the timeline of events proffered by Defendant and testified to by his witness, Renee Rodriguez, Mrs. Rodriguez had already arrived on the scene and retrieved and handed over the documents at this point in the encounter. *See* Tr.at 88:22-90:8. Mrs. Rodriguez did not provide any testimony on events leading up to the search of Defendant's vehicle.

*Delay* (Doc. 14), *Motion to Sever Count I From Count II* (Doc. 13), and *Motion to Suppress Evidence* (Doc. 23) are DENIED.

_____
**UNITED STATES DISTRICT JUDGE**